1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ORLANDO LOPEZ,

        Petitioner,

  v.

WILLIAM MUNIZ, Warden
of Salinas Valley State Prison,

        Respondent.
——————————————————/

No. C 17-03390 WHA

**ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS**

**INTRODUCTION**

      Petitioner is a state prisoner serving a sentence of 311 years to life. He seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2254. By all accounts, including petitioner's own account, he rode with two others to shoot up a party where a young boy was shot to death. Among other things, petitioner claims the evidence failed to show he actually used a firearm at the scene of the murder. While the victims' accounts understandably varied in who shot and from where, the evidence amply supported the jury's verdict against petitioner. For the reasons stated below, the petition is **DENIED**.

**STATEMENT**

      This case arises out of a murder of a four-year old boy in 2011 in Lake County. Petitioner Orlando Lopez and co-accused Paul Braden were convicted of murder and other related crimes. The following facts are taken from the California Court of Appeal opinion.

### 1.    JUNE 10 FIGHT AT GRADUATION.

On June 10, 2011, Josh Gamble and his friend Joseph Armijo attended a graduation ceremony at Lower Lake High School. A group of youths known as the "Avenue Boyz" approached them as they sat in the bleachers. Dennis Fry, one member of the Avenue Boyz, taunted Gamble. The Avenue Boyz and Leonardo Lopez (brother of petitioner), who was not a member of the Avenue Boyz, later approached Gamble and Armijo outside. Fry and Gamble exchanged words, then Leonardo Lopez hit Gamble in the face with either his fist or a lead pipe. Petitioner had no role.

### 2.    JUNE 18 PARTY AT ASHLI ATHAS'S HOUSE.

Leonardo Lopez and his girlfriend, Ashli Athas, lived with Athas's grandmother in Clearlake. In the afternoon on June 18, 2011, people started arriving at the house for a party. The guests included members of the Avenue Boyz, Paul Braden, and petitioner, who went by the nickname "Nano."

At one point during the party, Athas heard Braden arguing on the phone with Ross Sparks and Crystal Pearls. Braden said, "Let's meet up and handle this." Leonardo Lopez heard Braden say, "I'll kill you." One witness testified that petitioner tried "to schedule somewhere to go to fight." When asked who he was speaking to, petitioner replied "bitch ass Ross Sparks." A group discussed fighting Sparks. Braden stated, "we can meet them . . . and you guys can start fighting, I'll be hiding in the bushes and I can pop out and start shooting them." Petitioner was present for the discussion but still on the phone at that time.

At one point during the party, Braden said he could have a gun delivered. Subsequently, petitioner and Braden left the party together. When they returned, Braden had a wrapped, black shotgun. Braden then went into the garage and began sawing off the butt of the shotgun while petitioner stood either nearby or at the entrance of the garage.

After modifying the shotgun, Braden sat on the patio cycling shells through his shotgun and making threatening statements. Braden said, "I didn't bring this gun to Clearlake for nothing, let's go use it. I didn't go get it for no reason." Braden further stated, "I'm bored, let's go shoot somebody." At that time, petitioner stood on the patio on his phone. Braden also said

he wanted to "[w]alk down to Ross's house and start shooting them." Petitioner sat "a ways away" at that time.

Around 9:30 or 10:00 p.m., Athas's grandmother told everyone to leave. Ashli Athas testified that Braden carried a shotgun but that petitioner held nothing. Petitioner and Braden left between 10:15 and 10:30 p.m. Kevin Stone picked them up in a car.

### 3. JUNE 18 MURDER.

Desiree Kirby and Ross Sparks lived in Clearlake with their two children, Skyler and Eden. A wooden fence, six feet tall, separated their yard from their neighbor Curtis Eeds's yard. The wooden fence had a gap with two missing boards. In addition, the top of another portion of the fence had a notch where a piece of board had fallen away. A washing machine sat in Eeds's yard behind the notch in the fence.

On June 18, 2011, the same day as the party at Athas's place, Sparks and Kirby held a barbecue in their backyard. That day, Sparks received a number of threatening texts and phone calls. When Sparks called the number texting him, he recognized petitioner's voice on the other end. A text at 7:20 p.m. said, "let's go toes at oak hill u ready." A second text from the same number stated, "Its nano im fuck u up u fuckn punk fuck your life." In one phone call, petitioner told Sparks that he would "bash" Sparks and his family with the same lead pipe his brother Leonardo Lopez had used to beat Josh Gamble. Witnesses saw Sparks on the phone, angrily yelling and saying that he was willing to fight. The last phone call between Sparks and petitioner took place at 7:42 p.m.

Between 10:30 to 10:45 p.m., the partygoers in the yard heard a loud boom or gunshot from behind the wooden fence. The partygoers gave varied testimony with respect to the sound, duration, and amount of the gunshots and the physical attributes of the shooters. The eyewitness testimony, however, consistently placed two shooters at the fence.

Skyler, age four, died in the shooting. Desiree Kirby, Andrew Sparks, Joseph Armijo, Ian Griffith, and Amanda Gamble received wounds from the shots, suffering injuries of varying severity.

*          *          *

3

In December 2011, the Lake County District Attorney filed a consolidated information against petitioner and co-accused Paul Braden in the Superior Court of California, County of Lake, charging them with fifteen counts related to the backyard shooting. These charges included: (1) first-degree murder; (2) six counts of assault with a firearm; (3) five counts of attempted murder; (4) two counts of mayhem; and (5) discharging a firearm at an inhabited dwelling. The information further alleged that they had personally discharged a firearm causing great bodily injury or death, personally discharged a firearm, personally used a firearm, and inflicted great bodily injury (Dkt. No. 20-7 at 2). In June 2012, petitioner and Braden's respective juries found them guilty on all counts and found all of the special allegations true. In August 2012, the trial court sentenced petitioner to 311 years to life and Braden to 312 years to life (*id.* at 3).

Previously, in November 2011, the Lake County District Attorney had filed an amended information charging Kevin Stone with the same fifteen counts plus unlawful possession of a firearm. On the same day as the amended information, Stone pleaded no contest to three counts. The District Attorney dropped the remaining charges. As a part of the negotiated deal, Stone agreed to testify against petitioner and Braden at trial. Stone received a total term of ten years and four months in prison (*id.* at 2–3).

**4.  TESTIMONY OF PETITIONER AND ANTHONY GASTON.**

At trial, the prosecution theorized that both Braden and petitioner fired shotguns into the yard that night. On June 28, Sergeant Clements interviewed petitioner, who stated he had been with Braden at Athas's house. Petitioner witnessed Braden saw the butt off a black shotgun and wrap the end with duct tape. According to petitioner, Braden had been "talking shit" to Ross Sparks and discussing "shooting up the house." Petitioner further recollected that Braden told guests at Athas's place, "I wanna shoot somebody." Petitioner stated that Kevin Stone, driven by his girlfriend, picked up him and Braden. They went to an apartment where Stone retrieved a .22-caliber rifle and returned without his girlfriend. Stone drove Braden and petitioner to Eeds's house. When they arrived, petitioner said Braden walked up to the fence and started shooting. Petitioner denied that he'd had a shotgun that night.

When Clearlake Police Department Sergeant Martin Snyder responded to the scene, he observed holes in the residence made by nine gauge shot and other holes therein made by fifteen gauge shot. Both types could have been fired from a single shotgun. Sergeant Snyder also recovered three shotgun shell casings. He identified two of these casings as fifteen gauge shot, but he could not identify the third casing. A criminalist could not conclude the shells had been fired from the same weapon; however, the criminalist opined that they had been "cycled" (loaded and ejected) through the same weapon.

The prosecution relied on the testimony of Anthony Gaston, a member of the Avenue Boyz, to establish that petitioner had had access to a shotgun that night. Gaston testified that around June 14 he'd stashed a single-shot shotgun between boxes on the porch at Ashli Athas's place. According to Gaston, petitioner was present when Gaston brought the shotgun to Athas's place. Petitioner also saw where Gaston hid the shotgun on the porch. On the afternoon of the June 18 party, Gaston saw the shotgun but did not see it again after that. In fact, Gaston did not return to Athas's house after June 18 to see if the shotgun remained. Rather, Gaston testified that Leonardo Lopez later told him the shotgun had been used and was no longer at Athas's place. Gaston provided no further details.

### 5. TESTIMONY OF KEVIN STONE.

Kevin Stone testified against both petitioner and Braden as part of a plea bargain. Stone said he testified against them to avoid being blamed for the shootings, to help put Braden in prison, and to "save my own ass really." At the time of the shooting, Stone admitted that he had been addicted to methamphetamine for eight years.

Stone testified that he texted with petitioner on June 18 — the day of the shooting. According to Stone, petitioner asked him through text whether he was interested in "pulling a lick," which meant getting something for free, including by robbery. Stone testified that petitioner texted, "I got a lick and I got the straps and everything," "strap" being a firearm. Stone said he would pick up petitioner.

Stone testified that his girlfriend drove him to pick up Braden and petitioner. Stone stated that Braden held a shotgun. He further stated that petitioner held something

"similar," which Stone believed to be another shotgun. His girlfriend drove them to her apartment where Stone testified that he retrieved a .22-caliber rifle. She remained in the apartment.

Stone testified that he then drove Braden and petitioner to Eeds's place. According to Stone, petitioner entered Eeds's yard first, followed by Braden and then Stone. Stone testified that Braden and petitioner carried shotguns into the yard. Stone had his .22-caliber rifle. When Stone heard the first shotgun blast, he looked up to see Braden shooting his shotgun over the fence into the party. Stone watched Braden aim and shoot "about three times." In total, Stone heard five or six blasts. Stone saw petitioner standing still and watching Braden. Stone did not see petitioner fire his weapon, which he believed to be a shotgun. In an earlier interview, Stone had told police that he saw petitioner stepping through the gap in the fence. At trial, however, he told the jury that story was based on what he had heard at the preliminary hearing and that he could not say where petitioner had stood at that time. Stone also testified that he did not shoot his .22-caliber rifle that night.

Stone further testified that he and petitioner ran back to the car, that Braden followed moments later, and that he then sped off and crashed the car into some bushes. According to Stone, the men subsequently got out of the wrecked car and discarded their weapons into foliage as they fled. Police later recovered a .22-caliber rifle but no shotguns.

In an attempt to show that Stone himself was the second shooter, petitioner presented Valentin Aguilar, who had been in jail with Stone. According to Aguilar, Stone told him that he'd picked up Braden and petitioner on the night of the shooting, then suggested they rob Eeds. Stone told Aguilar that Braden had a shotgun, but petitioner did not have a weapon. Stone admitted to putting his .22-caliber rifle over the fence and firing once into the ground and once into the air. Stone told Aguilar that he did not hit anyone. Stone further stated that Braden fired multiple times in the direction of the people on the other side of the fence. Stone also told Aguilar that he had lied about petitioner being armed because petitioner had said that Stone had been armed.

6

In the prosecutor's rebuttal, Stone denied telling Aguilar that he fired his .22-caliber rifle that night. Stone reaffirmed his testimony that petitioner had a shotgun on June 18.

*            *            *

After sentencing, petitioner timely appealed. On appeal, petitioner asserted an instructional error claim and related claims of ineffective assistance of counsel. He claimed, *inter alia*, that his lawyer's failure to request jury instruction regarding accomplice testimony and to introduce expert testimony relating to firearm acoustic signatures and behavior of chronic methamphetamine users constituted deficient assistance. He also challenged the sufficiency of the evidence to support the judgment (Dkt. No. 1 at 7–12). In addition to his direct appeal, petitioner filed a petition for a writ of habeas corpus. The California Court of Appeal denied this petition in February 2016 (Dkt. No. 1-1, Exh. A).

In an unpublished decision in February 2016, the California Court of Appeal reversed petitioner's first-degree murder conviction on the basis of flawed jury instruction and ordered the trial court to stay the sentences on two counts pursuant to California Penal Code § 654 (Dkt. No. 20-7 at 12, 53–54). The prosecutor subsequently accepted a reduction of the conviction to second-degree murder (Dkt. No. 16-1 at 1 n.3). The California Court of Appeal otherwise affirmed the judgment, finding the failure to instruct on corroboration of accomplice testimony harmless and petitioner's convictions supported by substantial evidence (Dkt. No. 20-7 at 28–32, 48–52). The California Supreme Court denied petitioner's petition for review (Dkt. No. 1-1, Exh. C). In a separate decision, the California Court of Appeal denied petitioner's writ of habeas corpus. The California Supreme Court subsequently denied petitioner's petition for writ of habeas corpus (*id.*, Exhs. A, D). This federal habeas petition followed (Dkt. No. 1).

## ANALYSIS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, applies to this action. Pursuant to AEDPA, federal courts may grant a writ of habeas corpus only if the state-court ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United states" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Where, as here, the California Supreme Court denied review of petitioner's direct appeal without comment, this order must look to the last reasoned decision, the state appellate court's decision, as the basis for the state court's judgment. *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

### 1. SUFFICIENCY OF THE EVIDENCE.

Petitioner claims he is entitled to federal habeas relief because insufficient evidence supported his convictions — specifically, petitioner argues that the evidence suggests Stone was the second shooter (Dkt. No. 1 ¶ 111). Evidence is constitutionally sufficient to support a conviction when, upon "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. Notably, "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curium). On habeas review, a federal court may only overturn a state court decision rejecting a sufficiency of the evidence challenge "if the state court decision was 'objectively unreasonable.'" *Ibid.* (citation omitted). "[T]he only question under *Jackson* is whether that finding was so insupportable as to fall bellow the threshold of bare rationality." *Id.* at 656.

### A. Second-Degree Murder.

Murders not specified as first degree under Section 189 of the California Penal Code are murders of the second degree. Second-degree murder requires "malice aforethought." Cal. Penal Code § 187(a). Malice aforethought may be either express or implied. Express malice is "a deliberate intention to unlawfully take away the life of a fellow creature." Implied malice manifests when either "no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." Cal. Penal Code §§ 188(a)(1–2).

8

*First*, petitioner points to the lack of "credible, substantial evidence that [he] ever held a gun that night, let alone that he shot it" (Dkt. No. 1 ¶ 116). Given this lack of evidence, petitioner contests the state appellate court's determination that the evidence sufficiently showed "[petitioner] *personally* shot and killed Skyler Rapp" (Dkt. No. 1 ¶ 131). Under California law, however, the prosecution was not required to prove that the shot that killed the young boy came from petitioner's particular weapon in order to convict him of second-degree murder. Rather, the prosecution need only show he aided and abetted "a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." *People v. Chiu*, 59 Cal. 4th 155, 166 (2014). Liability in accordance with the natural and probable consequences doctrine "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." (*id.* at 162) (internal quotation marks and citation omitted). Here, the state appellate court found "sufficient evidence to convict both [petitioner and Braden] on a *direct* aiding and abetting theory," which demands a higher burden of proof than the natural and probable consequences doctrine. It follows that sufficient evidence supports petitioner's second-degree murder conviction pursuant to the natural and probable consequences doctrine. In light of the fact that petitioner admittedly accompanied two armed persons to the scene of a murder, this order finds the state appellate court's determination objectively reasonable.

Moreover, the state appellate court found that, while not overwhelming, circumstantial evidence established that petitioner had access to a shotgun on the night of the shooting. Specifically, Anthony Gaston testified that he'd hidden a shotgun at Athas's place several days before the shooting and that petitioner knew of the hiding place. While the shotgun remained in place the day of the shooting, Leonardo Lopez later told Gaston that the gun had been used and was gone. The state appellate court noted that neither the witnesses at Athas's party nor Stone's girlfriend, who later rode in a car with petitioner, testified that petitioner had a gun that night. Despite the foregoing, the state appellate court aptly stated that "the existence of evidence from which the jurors could infer [petitioner] did *not* have a shotgun does not negate the evidence

from which the jurors could infer [he] *did* have one" (Dkt. No. 20-7 at 52 n.37). Petitioner also emphasizes Stone's testimony that petitioner never fired his shotgun into the backyard (Dkt. No. 1 ¶ 120). While this testimony favored petitioner, the state appellate court reasoned that the jury could have believed that Stone had been lying to protect petitioner, who he described as a "really good" friend (Dkt. No. 20-7 at 52). Again, the jury determines the credibility of a witness's testimony, whether in whole or in part. Given the doubly deferential standard, the state appellate court made an objectively reasonable determination.

*Second*, petitioner argues the possibility that only one person (Braden) fired a gun into the yard that night. Specifically, petitioner contends that "the location of shells found in Eeds's yard was consistent with one person having fired all of the rounds" (Dkt. No. 1 ¶ 121). Because several eyewitnesses testified that two people fired guns from the fence, the state appellate court rejected this argument (Dkt. No. 20-7 at 52 n.38). Moreover, the testimony cited by petitioner does not conclusively establish that only one person fired a gun. Given the locations of the recovered shotgun shells, Sergeant Snyder found that one person alone could have been shooting from the notch in the fence; however, he also found that one person alone could have been shooting from the gap in the fence (Dkt. No. 18-9 at 2374–75). Evidence suggesting that only one shooter fired from either location does not eliminate the possibility that a shooter fired from each location that night. Accordingly, the jury could reasonably infer that two people had fired guns or that a shooter kept his empty shells. Applying the required two layers of deference, the state appellate court made an objectively reasonable determination.

*Third*, petitioner argues that Stone's criminal history suggests Stone was in fact the second shooter that night (Dkt. No. 1 ¶¶ 111–13). Petitioner emphasizes Stone's gun obsession, his habitual methamphetamine use, and the fact that Stone fled town after the shooting. The state appellate court rejected this argument finding that "none of those circumstances constitute[d] strongly circumstantial evidence that Stone was a shooter, rather than a person who had the more limited involvement to which he admitted at trial" (Dkt. No. 20-7 at 49 n.35). Petitioner further argues that Valentin Aguilar's testimony supports his theory of Stone as the second shooter. Aguilar, a jailhouse informant, testified that Stone admitted to firing over the

fence (but not hitting anyone). Stone also told Aguilar that petitioner had no weapon at the scene (Dkt. No. 1 ¶ 114). The state appellate court rejected this argument, noting that the jury had no obligation to credit Aguilar's favorable testimony. (Dkt. No. 20-7 at 51 n.36). Given the highly deferential standard, this order finds that the state appellate court's determination objectively reasonable.

*Fourth*, petitioner contends that eyewitness testimony describing the shooters and the sound of the gunshots showed the second shooter to be Stone firing his .22-caliber rifle (*id.* ¶ 113). The Eeds side of the fence had a gap with two missing boards and a washing machine underneath a notch at the top of another portion of the fence. Ross Sparks testified the notch shooter had short hair. Josh Gamble testified the same. He also testified the notch shooter stood at least six-feet tall. Stone had short hair at the time of the shooting and stood six-feet tall. Petitioner had longer hair at that time and stood around five-foot six-inches tall (Dkt. No. 17-9, Booking Photo). Since Braden was bald and petitioner was shorter with longer hair, an argument could be made that neither man fired from the notch that night. The state appellate court acknowledged that "Stone better matched the description of the shooter at the notch" but nevertheless concluded that this testimony "did not obligate the jury to find that Stone, rather than [petitioner]" fired from the notch (Dkt. No. 20-7 at 49–50). Evidence also contradicted petitioner's assertion. Andrew Sparks testified the notch shooter was clean-shaven. Stone had a "sizeable" mustache at the time. Petitioner's booking photo shows he had a goatee and thin mustache. Furthermore, while Gamble testified the notch shooter stood at least six-feet tall, Ross Sparks testified the notch shooter must have been kneeling on the washing machine. And, the shooters may have shot by turns. In addition, poor visibility existed on the night of the shooting. Thus, even though the state appellate court found a basis for petitioner to argue that Stone fired from the notch and Braden fired from the gap in the fence, the court also found a rational jury could decide "not to put much weight on the very sparse descriptions offered by the victims" (Dkt. No. 20-7 at 50). Given the poor visibility and the high level of deference required, the state appellate court made an objectively reasonable determination.

Petitioner next argues that the testimony with respect to the acoustics of the gunshots showed that Braden fired a shotgun and Stone fired a .22-caliber rifle from the fence (Dkt. No. 1 ¶ 113). The state appellate court rejected this argument stating that "the trial testimony did not conclusively establish that one of the shooters [fired] a .22 rifle" (Dkt. No. 20-7 at 50). Ross Sparks testified to hearing a "big booming sound" and a "lower sounding shot." He explained the lower sounding shot could have been "birdshot from another shotgun." Josh Gamble testified the shot from the notch sounded like a "firecracker," whereas the shot from the gap in the fence sounded like a "boom." Andrew Sparks testified the weapons sounded "real similar" but later testified they sounded different due to different types of rounds being used. The state appellate court noted that, "although the weight of the evidence suggest[ed] the firearms sounded different, the jury [received] an explanation that was consistent with both weapons being shotguns" (*id.* at 51). Given the lack of contrary evidence, the state appellate court found that a rational jury could find petitioner and Braden fired shotguns from the fence. This order agrees. Thus, the state appellate court made an objectively reasonable determination.

*Fifth*, petitioner contends insufficient evidence supported the jury's conclusion that petitioner acted with premeditation and deliberation (Dkt. No. 1 ¶ 133). As the state appellate court downgraded petitioner's first-degree murder conviction to second-degree murder, this order need not address premeditation and deliberation. Second-degree murder requires malice aforethought, which may be either express or implied. Express malice is "a deliberate intention to unlawfully take away the life of a fellow creature." Implied malice manifests when either "no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." Cal. Penal Code §§ 188(a)(1–2).

Petitioner argues that he did not plan to shoot or kill anyone, rather he only intended "to organize a fight between the Avenue Boyz and Josh Gamble" (Dkt. No. 1 ¶¶ 135–36). The state appellate court concluded that the jury could infer from the evidence that petitioner and Braden planned the shooting before leaving Athas's party. Petitioner spent the day and evening of the shooting with Braden and left the gathering at Athas's house with Braden to obtain a shotgun.

Petitioner told police that Braden made comments about "shooting up the house." Stone testified petitioner contacted him to recruit for a "lick" (Dkt. No. 20-7 at 51–52). Petitioner argues that "no one said the 'lick' involved any shooting or homicide" (*id.* ¶ 135). Nevertheless, petitioner accompanied Braden and Stone, who both had firearms, to Eeds's house that night even though he denied having a gun himself. The jury could thus infer that petitioner anticipated gun violence.

In addition, petitioner got into a heated dispute with Ross Sparks on the day of the shooting. At one point, petitioner threatened Sparks and his family with physical harm. While petitioner argues that he only meant to set up a fistfight, the state appellate court found that the "evidence of hostility between [petitioner] and Sparks at least demonstrate[d] a possible motive for the shooting" (Dkt. No. 20-7 at 52). In light of the evidence presented, a rational jury could find that petitioner possessed malice aforethought as required for second-degree murder. As such, the state appellate court made an objectively reasonable determination.

The state appellate court thus concluded that substantial evidence supported petitioner's second-degree murder conviction. Upon careful consideration of petitioner's arguments and the relevant parts of the evidentiary record, this order finds the state appellate court's determination objectively reasonable.

**B.** **Attempted Murder.**

Section 664 of the California Penal Code provides that "[e]very person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration" may be punished in accordance with that provision. "An attempt to commit a crime consists of two elements: specific intent to commit the crime, and a direct but ineffectual act done toward its commission." Cal. Penal Code § 21a.

Referencing the same evidence as above, the state appellate court concluded that the jury could find petitioner had specific intent to kill as required to support the attempted murder charges. As stated previously, this order finds the state appellate court's determination that substantial evidence supported petitioner's second-degree murder conviction objectively

13

reasonable.  Accordingly, the state appellate court made an objectively reasonable

determination regarding petitioner's attempted murder convictions.

### C.    Mayhem.

Section 203 of the California Penal Code provides that "[e]very person who unlawfully

and maliciously deprives a human being of a member of his body, or disables, disfigures, or

renders it useless . . . is guilty of mayhem."  Petitioner does not contest that multiple victims

were wounded within the meaning of this section.  As this order finds the state appellate court

reasonably determined that sufficient evidence supported petitioner's second-degree murder and

attempted murder convictions, it follows that the state appellate court also made an objectively

reasonable determination with respect to his mayhem convictions.

### D.    Weapons-Related Charges.

To be convicted under Section 245 of the California Penal Code, a person must

"commit[] an assault upon the person of another with a firearm."  Pursuant to Section 246 of

the California Penal Code, "[a]ny person who shall maliciously and willfully discharge a

firearm at an inhabited dwelling house [or] occupied building . . . is guilty of a felony."

Petitioner argues insufficient evidence supported his convictions of assault with a

firearm (Section 245) and discharging a firearm at an inhabited dwelling (Section 246).

He further argues that insufficient evidence supported the numerous use enhancements to his

sentence.  These enhancements include personally discharging a firearm causing great bodily

injury or death, personally discharging a firearm, personally using a firearm, and inflicting great

bodily injury.  Cal. Penal Code §§ 12022.53(b–d), 12022.5(a), 12022.7(a), (d).

The state appellate court noted that circumstantial evidence showed petitioner had

access to a shotgun on the night of the shooting.  Moreover, petitioner threatened Ross Sparks

and his family with physical harm on the day of the shooting.  In any event, as stated above, the

state appellate court reasonably determined that sufficient evidence supported petitioner's

convictions of second-degree murder, attempted murder, and mayhem.  Each of these

convictions hinges on petitioner using a firearm.  Accordingly, the state appellate court

1    reasonably determined that substantial evidence supported petitioner's weapons-related

2    convictions.

3                              *                *                *

4          This order finds the state appellate court reasonably concluded that substantial evidence

5    supported each of petitioner's convictions.  Therefore, petitioner's insufficient evidence claim is

6    **DENIED**.

7          **2.    INEFFECTIVE ASSISTANCE OF COUNSEL.**

8          Petitioner maintains that his counsel rendered ineffective assistance by failing to:

9    (1) introduce expert testimony of acoustic signatures of firearms and the behavior of chronic

10   methamphetamine addicts like Kevin Stone; (2) use statements by Stone as evidence;

11   (3) introduce evidence of the respective heights of petitioner and Paul Braden; and (4) instruct

12   the jury on corroboration of accomplice testimony.  Petitioner further claims that the cumulative

13   impact of counsel's deficient performance prejudiced him (Dkt. No. 1 ¶¶ 169–88).

14         In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner

15   must satisfy two requirements.  *First*, a petitioner must establish that counsel's performance

16   was deficient insofar as it fell below an "objective standard of reasonableness" under prevailing

17   professional norms.  *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).  *Second*, a

18   petitioner must establish that he was prejudiced by counsel's deficient performance —

19   specifically, a petitioner must show "there is a reasonable probability that, but for counsel's

20   unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

21   "The likelihood of a different result must be substantial, not just conceivable."  *Harrington v.*

22   *Richter*, 562 U.S. 86, 112 (citing *Strickland*, 466 U.S. at 693).

23         The standards of AEDPA and *Strickland* are "highly deferential . . . and when the two

24   apply in tandem, review is doubly so."  *Id.* at 105 (internal quotation marks and citation

25   omitted).  Under AEDPA, "the question is not whether counsel's actions were reasonable.

26   The question is whether there is any reasonable argument that counsel satisfied *Strickland's*

27   deferential standard."  *Ibid.*

28

### A.    Failure to Introduce Expert Testimony Of Acoustic Signatures of Firearms.

As stated previously, the prosecution theorized that both Braden and petitioner fired shotguns from the fence. Furthermore, it is undisputed that Stone had a .22-caliber rifle that night; however, the police only recovered shotgun shell casings at the scene of the shooting.

Given eyewitness testimony that the guns fired that night made different sounds, petitioner argues that trial counsel rendered ineffective assistance by failing to introduce expert testimony of acoustic signatures of firearms (Dkt. No. 1 at 48–54). In support of this contention, petitioner presents, as he did on state habeas, the declaration of Ben Tisa, a firearms expert and former Special Agent for the FBI. Expert Tisa contended that "the witnesses' descriptions of the sound signatures of the two weapons fired are inconsistent with the firing of two shotguns but are . . . highly consistent with the firing of a .22-caliber rifle and a semi-automatic shotgun" (Dkt. No. 1-1, Exh. E ¶ 32). Specifically, Expert Tisa's declaration stated that: (1) while witnesses described several shots coming from both locations of the fence, petitioner could not have fired the single-action shotgun he allegedly possessed more than once in the time period of the shooting; (2) given eyewitness testimony that the gunshots sounded different, the guns being fired that night were most likely a semi-automatic shotgun (Braden's) and a .22-caliber rifle; (3) if two shotguns fired in close proximity, there would have been no perceivable difference in sound to the witnesses; and (4) if a single-action shotgun fired that night, he would have expected the police to find ejected shotgun cases with device marks distinct from ejected shells associated with a semi-automatic shotgun (*id.* ¶¶ 7, 21–26, 33–34). The California Court of Appeal denied review of petitioner's state habeas without comment.

*First*, Expert Tisa contended that, while witnesses described several shots coming from both locations of the fence, petitioner could not have fired the single-action shotgun he allegedly possessed more than once in the time period of the shooting (Dkt. No. 1-1, Exh. E ¶ 21). Once would have been enough. Moreover, the eyewitness testimony regarding the period of the shooting and the number of shots varied significantly. Witnesses described the shooting as lasting ten seconds, three minutes, five seconds, and at least twelve seconds — six or seven shots total with a couple of seconds between shots (Dkt. Nos. 18-4 at 1065; 18-5 at 1282–84;

16

18-6 at 1594–95; 18-7 at 1824–26). The length of the shooting thus cannot be determined with certainty. Accordingly, Expert Tisa's assertion that petitioner could only have fired his supposed shotgun once in the "very short time" frame — five seconds between the first and last shots — rests on a tenuous assumption.

Expert Tisa's contention would have carried little weight, given that eyewitness testimony regarding the number and location of the gunshots and muzzle flashes wildly varied. Witnesses testified the shots totaled anywhere from six shots to fourteen shots (Dkt. Nos. 18-4 at 1203–05; 18-5 at 1282–84). With respect to muzzle flashes, one witness saw three or four from each spot at the fence, another saw two flashes from the notch and one from the gap in the fence, and still another saw two or three flashes from the notch and four or five from the gap in the fence (Dkt. Nos. 18-4 at 1065, 1203–05; 18-6 at 1594–95).

*Second*, Expert Tisa expressed his opinion, based on witness descriptions of different sounding gunshots, that the gun being fired from the notch was most likely a .22-caliber rifle and that the gun being fired from the gap in the fence was a semi-automatic shotgun. He supported this assertion by stating that "there is little perceived distinction in the sound signatures of [semi-automatic and single-action shotguns] other than the rates of fire" (Dkt. No. 1-1, Exh. E. ¶ 26, 33–34). Again, however, eyewitness testimony with respect to the differing sounds and location of the gunshots wildly varied.

*Third*, Expert Tisa stated that the shells found at the scene were *unlikely* from petitioner's supposed shotgun. It would have been easy, however, for anyone firing a single shot to simply pocket his empty shells as he removed the empties and re-loaded. Moreover, as discussed previously, a rational jury could infer from this evidence and other evidence in the record that petitioner fired a shotgun that night. Petitioner knew of the hidden shotgun at Athas's place. The shotgun remained there the day of the shooting but was later used. Petitioner got into a heated dispute with Ross Sparks that day.

There would have been too many holes in the expert's theories to have changed the outcome or so the state appellate court could have reasonably concluded. Accordingly,

petitioner has not shown that the state appellate court unreasonably denied his claim for ineffective assistance of counsel.

### B. Failure to Introduce Expert Testimony Relating to Behavior of Methamphetamine Addicts.

Petitioner argues his trial counsel rendered ineffective assistance by failing to properly investigate and present expert testimony of a forensic psychiatric expert relating to the behavior of chronic methamphetamine addicts like Stone (Dkt. No. 1 ¶¶ 189–90).

Petitioner argues that trial counsel had an obligation "to offer all evidence available to him to support the view that Kevin Stone was lying when he testified that [petitioner] had a gun at the scene," including expert testimony (*id.* ¶¶ 190). In support of this contention, petitioner presents, as he did on state habeas, the declaration of a clinical pharmacist. The declaration stated that methamphetamine-addicted persons are more likely to act violently, recklessly, and irrationally than non-methamphetamine users. The declaration also stated that methamphetamine and alcohol, both of which Stone admitted to using that night, can be "a dangerous combination of drugs." The declaration also provided that "unprovoked attacks by methamphetamine users are well-known to occur" (*id.* ¶ 192).

Even if such testimony had been provided, trial counsel's decision to forego the introduction of expert testimony on this subject did not fall below an objective standard of reasonableness. The jury knew of Stone's chronic methamphetamine use. Stone admitted at trial that he had an extensive criminal history, that he frequently used methamphetamine, and that he would "pretty much do[] whatever it took" to support his habit. Stone further admitted that he sold drugs (Dkt. Nos. 18-9 at 2381; 18-10 at 2501–02). Indeed, trial counsel drew attention to Stone's criminal past and methamphetamine use, speaking of Stone's "readiness to do evil" (Dkt. No. 19 at 2837). In addition, the behavior of chronic methamphetamine users is largely known to the public. In light of the foregoing and the highly deferential standard, petitioner has not shown that the state appellate court unreasonably denied his claim for ineffective assistance of counsel.

### C.      Failure to Use Evidence of Statements by Stone.

Petitioner argues that trial counsel failed to investigate Stone's prior inconsistent statements to the police and impeach him based on such statements (Dkt. No. 1 ¶¶ 195–247). Petitioner contends trial counsel intended to prove that Stone lied when he: (1) testified at trial that petitioner had a shotgun at the scene of the shooting; and (2) told police he saw petitioner coming back through the gap of the fence. Thus, petitioner asserts that trial counsel's failure to use Stone's prior statements to paint Stone as an "inveterate liar" constituted deficient assistance of counsel (*id.* ¶¶ 201–02).

Even though Stone placed a shotgun in petitioner's hands at the scene of the shooting, Stone also testified that petitioner did not fire the shotgun. Thus, trial counsel's decision to stop short of obliterating Stone's credibility seems to have been, or at least could have been, strategic. In fact, by the account of petitioner's current counsel, trial counsel believed Stone to be a "good witness" for petitioner (Dkt. No. 1-1 ¶ 35(a)). Given that trial counsel's tactical decisions deserve deference when based on strategic considerations, this decision did not fall below an objective standard of reasonableness. *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). In any event, petitioner did not suffer prejudice. *First*, petitioner admits that trial counsel made "references in his closing to two of Stone's three statements" (Dkt. No. 1 ¶ 203). *Second*, the jury received ample evidence indicating Stone was not entirely credible. Specifically, the jurors knew of Stone's plea bargain, his extensive criminal history, his methamphetamine addiction, his history of selling that drug, his consumption of alcohol on the night of the shooting, and his fleeing after the shooting (Dkt. Nos. 18-9 at 2380–84; 18-10 at 2498–503, 2507–09, 2553, 2569). In light of this substantial evidence, petitioner has not shown that the state appellate court unreasonably denied his claim for ineffective assistance of counsel.

### D.      Failure to Introduce Evidence of the Respective Heights Of Petitioner and Paul Braden.

Petitioner argues that trial counsel rendered deficient assistance by failing to introduce evidence of the heights of petitioner and Paul Braden (Dkt. No. 1 ¶¶ 248–49). Petitioner asserts that Braden and Stone both stood around six feet, which, he says, aligned with the witnesses' descriptions of the shooters. By contrast, petitioner stood a little over five-foot six-inches

(Dkt. Nos. 1-1 ¶¶ 32–33; 17-9, Booking Photo).  But the witnesses were not so uniform in their description, as set forth below.  While Gamble testified the notch shooter stood six feet, he at first could not estimate the shooter's height.  Furthermore, Ross Sparks testified that the notch shooter must have been kneeling on the washing machine, which would conflict with Gamble's testimony.  Andrew Sparks, who was intoxicated at the time, testified the shooter at the gap in the fence stood almost six feet; however, that area of the fence was extremely dark.  Given the conflicting testimony regarding the heights of the two shooters and the highly deferential *Strickland* standard, this order cannot find that trial counsel's failure to submit this evidence fell below an objective standard of reasonableness.  As such, petitioner has not shown that the state appellate court unreasonably denied his claim for ineffective assistance of counsel.

### E.    Failure to Instruct Jury on Corroboration Of Accomplice Testimony.

Section 1111 of the California Penal Code provides that a conviction cannot "be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."  "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense."  *People v. Gonzales*, 52 Cal. 4th 254, 303 (2011) (citation omitted).  Corroborating "evidence is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth."  *Ibid.* (internal quotation marks and citation omitted).  With respect to Section 1111, "and to the extent that the uncorroborated testimony is not incredible or insubstantial on its face, the rule is not required by the Constitution or federal law."  *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000) (internal quotation marks and citation omitted).  Section 1111 further defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

The parties agree Stone acted as an accomplice of petitioner and Braden (Dkt. No. 20-7 at 29).  Petitioner thus contends that Stone's "uncorroborated testimony is so utterly incredible

1   or insubstantial on its face that the lack of corroboration" entitles petitioner to federal habeas

2   relief (Dkt. No. 1 ¶ 124) (internal quotation marks omitted).

3        The state appellate court found ample corroborative evidence. Petitioner spent the

4   day and evening of the shooting with Braden. Petitioner came to the scene of the shooting.

5   Earlier, petitioner got into a heated dispute with Ross Sparks on the day of the shooting, where

6   he threatened Sparks and his family with physical harm. Petitioner replies that he only intended

7   "to set up a fistfight . . . in an attempt to settle the minor conflict that had begun at the high

8   school," not "to unload a shotgun into a group of innocents" (Dkt. No. 1 ¶ 118). The state

9   appellate court rejected this argument noting that petitioner "went with Braden to obtain a

10  shotgun[] and [stood] nearby when Braden modified his shotgun." (Dkt. No. 20-7 at 31–32).

11  In addition, the state appellate court determined the "jury could infer that [petitioner] heard

12  Braden's comments at Athas's party expressing a desire to shoot someone." Considering that

13  petitioner "had access to a shotgun and traveled to the area of Sparks's home in the company of

14  Braden, despite Braden's violent comments," the state appellate court reasonably concluded

15  that ample evidence connected petitioner to the crime (*id*. at 32).

16       Accordingly, the state appellate court reasonably found trial counsel's failure to instruct

17  on accomplice liability harmless due to the sufficient corroborating evidence in the record (*id*.

18  at 31–32).

19               **F.**    **Cumulative Impact of Counsel's Performance.**

20       Petitioner argues that trial counsel's subsequent criminal behavior, mental health

21  problems, and history of head trauma casts doubt on "whether [petitioner's] lawyer" provided

22  effective assistance (Dkt. No. 1 ¶ 287). On August 2014, trial counsel's wife told a deputy

23  that trial counsel had been in a car accident "approximately two years earlier, which resulted in

24  significant head trauma" (Dkt. No. 1-1, Exh. O, Aug. 2014 Narrative at 3). Petitioner received

25  his sentence in August 2012. Petitioner argues that trial counsel suffered a head injury "close in

26  time to [petitioner's] trial" (Dkt. No. 1 ¶ 288). Even if this were accurate, trial counsel's wife

27  stated that trial counsel's increased paranoia and anxiety began *after* his most recent head injury

28  in July 2014 (Dkt. No. 1-1, Exh. O, Aug. 2014 Narrative at 3). Trial counsel's severe mental

health issues and criminal behavior subsequently followed.  Since this behavior escalated two years after the conclusion of trial, it is irrelevant to petitioner's ineffectiveness claim. *Strickland*, 466 U.S. at 690.  Moreover, an examination of trial counsel's bar history did not reveal any record of attorney discipline within the Northern District of California.  Therefore, this claim fails.

Petitioner also argues that the cumulative impact of all errors resulting from trial counsel's ineffective assistance prejudiced him (Dkt. No. 1 ¶¶ 265–69).  Petitioner failed to show any substantial constitutional error as a result of trial counsel's actions, as previously discussed.  Where there is no substantial constitutional error existing, no cumulative prejudice is possible.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).  Most importantly, petitioner has not shown the California Court of Appeal's denial of his ineffective assistance of counsel claims constituted an unreasonable application of clearly established federal law or an unreasonable application of the facts to that law.  Accordingly, this claim is **DENIED**.

## CONCLUSION

For the foregoing reasons, all claims in petitioner's Section 2254 petition are **DENIED**. Judgment will be entered separately.

**IT IS SO ORDERED.**

Dated:  August 9, 2019.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE